UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
JAN 13 2012
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

CYNTHIA ALLARD, *et al.*,  )
)
Plaintiff,  )
)
v.  ) Civil Case No. 10-2081 (RJL)
)
ERIC H. HOLDER, JR.,  )
United States Attorney General  )
)
Defendant.  )

## MEMORANDUM OPINION
(January 10, 2012) [#7]

Plaintiffs are a group of 35 current and former, Federal Bureau of Investigation ("FBI" or "Agency") agents that brought an action against Eric Holder, the Attorney General of the United States ("defendant") in his official capacity as the Cabinet secretary who oversees the FBI. Plaintiffs claim the FBI violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a, through a policy that imposes a term limit to field positions held by grade GS-14, Supervisory Special Agents ("SSAs"). Before the Court is defendant's Motion to Dismiss in Part or, in the Alternative, for Partial Summary Judgment ("Def.'s Mot.") [Dkt. #7]. This motion has two distinct parts: (1) defendant has moved for dismissal, or in the alternative for summary judgment, against the claims of six specific plaintiffs—Donald Codling, William Reiner, Daniel Caldwell, Kenneth Powers, Steven Lester, and David Stone; and (2) defendant has moved to dismiss all plaintiffs' disparate-impact claims for lack of subject matter jurisdiction. Upon consideration of the parties' pleadings and the relevant law, the Court GRANTS

1

defendant's motion for summary judgment against these six plaintiffs and GRANTS defendant's motion to dismiss plaintiffs' disparate-impact claims.

## BACKGROUND

In 2004, the FBI announced a new policy, the "Field Office Supervisory Term Limit Policy" ("the policy"). Compl. ¶ 7 [Dkt. #2]. Specifically, the policy set a five-year maximum term limit to field positions held by GS-14 SSAs. Compl. ¶ 7, 9; Def. Ex. A, 2004 Policy Mem. 1-2 [Dkt. #7-1].[1] At the end of the term, the policy prohibited affected SSAs from retaining their current positions but provided these supervisors with multiple career options. Compl. ¶¶ 1, 6, 9. These options included: (1) applying for a promotion to a higher grade position at FBI headquarters in Washington, D.C. or in the field; (2) accepting a temporary GS-14 or GS-15 level rotation to FBI headquarters; or (3) returning to investigative duties as a non-supervisory agent at the GS-13 level. *See* Compl. ¶ 9; *see also* Ex. A, 2004 Policy Mem. 3, 6-7.[2]

When the FBI announced its policy in 2004, all 35 plaintiffs were serving as GS-14 SSAs at various FBI field offices and were over 40 years old. Compl. ¶ 4, 6, 8. The

---

[1] Although the FBI announced the policy in April of 2004, Def. Ex. A, 2004 Policy Mem. 1, the FBI later delayed its implementation until June 3, 2004, Def. Ex. C, 2006 Policy Mem. 1 [Dkt. #7-3]. Further, the policy provided then current supervisors with an additional grace period, determined by a supervisor's tenure. Compl. ¶ 9; Def. Ex. A, 2004 Policy Mem. 2.

[2] The FBI also notified all affected agents in writing approximately one year prior to a term's expiration and explained the available career options. Def.'s Statement Material Facts Not in Dispute ("Def.'s Statement") ¶ 5 [Dkt. #7]; Def. Ex. C, 2006 Policy Mem. 4. In November of 2008, the FBI amended the policy to extend the term to seven years. Compl. ¶ 10; Def. Statement ¶ 7.

claims of only six of these plaintiffs, however, are at issue now: (1) Donald Codling; (2) William Reiner; (3) Daniel Caldwell; (4) Kenneth Powers; (5) Steven Lester; and (6) David Stone. Def.'s Mot. 1.[3]

### 1. Plaintiff Donald Codling

Donald Codling served as a GS-14 SSA in the FBI's Dallas Field Office from November 18, 2002 until February 15, 2008. *See* Pls.' Opp'n to Def.'s Mot ("Pls.' Opp'n") 3-4 [Dkt. #15]; Def. Ex. D, Codling's Sworn Statement ("Codling Statement") 2, 4 [Dkt. #7-4]. After Codling was informed that his SSA term would expire on November 18, 2007, he applied for and obtained a promotion to a GS-15 Unit Chief position at FBI headquarters. Pls.' Opp'n 4; Codling Statement 5-6. The FBI also paid Codling a $27,000 relocation bonus as part of the promotion. Def. Ex. E, Codling's Interrogatory Responses 2 [Dkt. #7-5].

### 2. Plaintiff William Reiner

William Reiner served as a GS-14 SSA in the FBI's New Haven Division from March 2002 until September of 2007. Pls.' Opp'n 5; Def. Ex. G, Reiner's Sworn Statement ("Reiner Statement") 1-2 [Dkt. #7-7]. Reiner was notified that his term as an SSA would expire in March 2007, but the FBI extended his term for six months for operational reasons. Pls.' Opp'n 5; Reiner Statement 4. Reiner then applied for and obtained a lateral GS-14 position as the New Haven Division's Chief Security Officer in

---

[3] The defendant initially moved for dismissal, or in the alternative for summary judgment, against the claims of *seven*, individual plaintiffs, *see* Def.'s Mot. 1, but has withdrawn its motion as to plaintiff David Hedges's claims. Def.'s Reply Mem. Supp. Def.'s Mot. ("Def.'s Reply") 8 n.2 [Dkt. # 18].

September 2007. Pls.' Opp'n 5-6; Pls.' Genuine Issues & Disputed Material Facts ("Pls.' Issues & Facts") ¶ 3 [Dkt. # 15-2].

### 3. Plaintiff Daniel Caldwell

In the FBI's Pittsburg Division, Daniel Caldwell served as a GS-14 SSA, supervising a squad based in Fairmont, West Virginia, from June of 2003 until April of 2007. Pls.' Opp'n 6-7; Def. Ex. L, Caldwell's Sworn Statement ("Caldwell Statement") 2, 8 [Dkt. #7-12]. Caldwell's SSA term limit was set to expire on August 25, 2008. Pls.' Opp'n 7; Caldwell Statement 6. On January 16, 2007, the head of the FBI's Pittsburgh office announced that Caldwell's squad was being disbanded but then offered Caldwell a lateral position supervising a new squad in Pittsburgh. Pls.' Opp'n 7; Caldwell Statement 6. Caldwell counter-offered that he would supervise the new squad in Pittsburgh until August of 2007 and then would replace the outgoing supervisor of a squad in Clarksburg, West Virginia. Pls.' Opp'n 7; Caldwell Statement 6. Although Caldwell's supervisor agreed to his counter offer, Caldwell later declined the offer, "voluntarily withdrew from the management program," and returned to investigative duties at the GS-13 grade because his estimated commuting time to the Pittsburgh position was 1.5 hours each way. Pls.' Opp'n 7; Caldwell Statement 6.

### 4. Plaintiff Kenneth Powers

Kenneth Powers served at the GS-14 SSA level in the FBI's Atlanta Division, first as a squad supervisor and then as a regional task-force coordinator, from March 1996 until he retired in June 2007 and accepted another job offer outside of the FBI. Pls.' Opp'n 9; Def. Ex. J, Powers's Sworn Statement ("Powers Statement") 1-2, 4 [Dkt. #7-

10]; Pls.' Issues & Facts ¶ 7. His term as an SSA had been set to expire in March 2008—some nine months later. Pls.' Opp'n 9; Powers Statement 4.

### 5. Plaintiff Steven Lester

Steven Lester served as a GS-14 SSA in the FBI's Dallas field office from April 1998 until he retired on December 31, 2005 and accepted another job offer. Pls.' Opp'n 8; Def. Ex. H, Lester's Sworn Statement ("Lester Statement") 1-2 [Dkt. #7-8]. Lester retired more than two years before his SSA term was set to expire on March 15, 2008. *See* Def. Ex. I, Lester's Interrogatory Responses 2 [Dkt. #7-9].

### 6. Plaintiff David Stone

David Stone served as a GS-14 SSA in the FBI's New York Division from 1988 until he retired in November 2007. Pls.' Opp'n 7-8; Def. Ex. K, Stone's Sworn Statement ("Stone Statement") 1, 3 [Dkt. #7-11]. Agent Stone's term as an SSA was set to expire in June 2007, but he asked for and received an extension until November 2007 to complete 30 years of FBI service. Pls.' Opp'n 7-8; Stone Statement 3.

## STANDARD OF REVIEW

Because I must rely in part on evidence outside of the pleadings to address plaintiffs' discrimination claims, I will consider defendant's motion under the summary judgment standard. *See* Fed. R. Civ. P. 12(d); *see also Martin v. Locke*, 659 F. Supp. 2d 140, 144-45 (D.D.C. 2009) (converting motion to dismiss into one for summary judgment). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

5

P. 56(a).[4] A party opposing summary judgment "may not rest upon the mere allegations . . . of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). If and when the nonmoving party offers evidence in response to the motion, that evidence "is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255 (internal citation omitted).

A court may also dismiss a complaint, or any portion of it, that does not fall within the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Where a motion to dismiss under Rule 12(b)(1) makes a facial attack on the complaint, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (internal citation and quotation marks omitted). "Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

## ANALYSIS

I.  **Defendant Is Entitled to Summary Judgment Against These Six Plaintiffs Because They Did Not Suffer an Adverse Employment Action.**

Plaintiffs claim that the FBI's policy "forcing older Grade 14 FBI Agents to leave positions where they were successfully serving constitutes discrimination based upon age in violation of the [ADEA]." Compl. ¶ 14. Courts traditionally apply the same approach

---

[4] A dispute about a material fact is genuine only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

to age-discrimination claims under the ADEA as that applied to gender or race claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying *Brady* framework under Title VII to ADEA claim). Under the ADEA, two elements are required for an employment discrimination claim: (1) the plaintiff suffered an adverse employment action (2) because of the employee's age. *Id.* "In most employment discrimination cases that reach federal court, there is no dispute that the employee has suffered an adverse employment action, and the sole question is whether the action occurred because of discrimination." *Id.* (internal citations omitted). Here, however, the defendant contests whether six of the plaintiffs suffered *any* adverse employment action.

Our Circuit has held that "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (internal citation omitted). Further, our Circuit has elaborated that an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal citations and quotations omitted).

Defendants contend that these six plaintiffs did not suffer an adverse personnel action because they either: (1) accepted a promotion to a higher position; (2) retained a GS-14 level position; (3) voluntarily retired; or (4) voluntarily declined a supervisory

7

position. Def.'s Mot. 12-15. For the following reasons, I agree that the defendant is entitled to summary judgment against these six plaintiffs: Codling, Reiner, Caldwell, Lester, Stone, and Powers.

### A. Plaintiff Codling, who accepted a promotion to a higher GS-15 grade position, did not suffer an adverse employment action.

Plaintiff Codling has failed to show, as a matter of law, that he has suffered an adverse employment action. In *Forkkio v. Powell*, our Circuit found that an employee who was *demoted* from section chief to unit chief but retained his grade, pay, and benefits (and received a pay raise) did not suffer an adverse employment action. 306 F.3d at 1131. Therefore, *a fortiori*, Codling did not suffer an adverse employment action when he sought and attained a promotion to a grade GS-15, Unit Chief position at FBI headquarters, with an accompanying $27,000 relocation incentive. *See* Pls.' Opp'n 4; Codling Statement 7; Def. Ex. E, Codling's Interrogatory Responses 3. It would be utterly unreasonable for a factfinder to conclude that Codling's promotion constituted an *adverse* employment action.[5]

Codling tries to circumvent the flaw in his claim by arguing that, because he accepted the promotion at FBI headquarters, the FBI's policy forced him both to leave his intended retirement home in Dallas and to sell this property "well below the normal

---

[5] Plaintiff's brief states that "Plaintiffs Codling, Hedges, Reiner and Caldwell allege discrimination based on a reassignment and removal of supervisory duties" and that a "reasonable jury could conclude that OGC [sic] these plaintiffs have 'significantly different responsibilities' than Squad Supervisors." Pls.' Opp'n 14 (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)). Codling, however, was not reassigned but promoted to a higher position. Further, this fact makes it irrelevant that Codling might have different responsibilities in his new role.

market price and incur[] loss in excess of $61,500." Pls.' Issues & Facts ¶ 1; Codling Statement 16-17. Unfortunate as these circumstances may be, they are, however, unrelated to Codling's employment status and are, therefore, irrelevant to the analysis of whether Codling suffered an adverse *employment* action. *See Douglas*, 559 F.3d at 552 (defining adverse employment action as a "significant change in employment status"); *see also Sauvage v. Snow*, 413 F. Supp. 2d 1289, 1298-99 (M.D. Fla. 2005) ("The determination of whether an adverse employment action has taken place cannot reasonably be based on non-employment related factors, such as the cost of living in an area . . . ."). Codling has not alleged that his SSA position had a provision guaranteeing his retirement in a certain place or a fair market price for his home. Accordingly, no reasonable juror could find that Codling suffered an adverse employment action.

### B. Plaintiff Reiner, who retained his GS-14 grade and pay, did not suffer an adverse employment action.

Plaintiff Reiner has also failed to show that he suffered an adverse employment action when the FBI allowed him to retain his GS-14 grade and transfer from a Squad Supervisor to a Chief Security Officer position. Lateral transfers may constitute adverse employment actions where, for example, an employee loses supervisory duties or is reassigned with "significantly different responsibilities." *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). Reiner, however, has failed to provide *any* evidence that his new assignment's duties constitute "significantly diminished responsibilities." *Id.* at 365. Instead, Reiner relies only on his own subjective evaluation of his former job, Pls.' Opp'n 5 (Reiner's stating that he considers the SSA position "one of the most important

9

'backbone' positions within the FBI"), and conclusory statements about his previous position's duties, *see, e.g., id.* at 5-6 ("Agent Reiner left his cherished position as a Field Supervisor . . . . In doing so, he gave up the supervisory duties that go with being a Squad Supervisor."); Pls.' Issues & Facts 6 ("As he has lost his squad supervisory duties, Reiner has suffered legal harm."). Reiner's comments about his new position are unsupported and similarly unavailing as evidence of an adverse employment action. *See* Pls.' Opp'n 5-6 ("[Reiner] accepted an administrative position as the Security Officer."); Pls.' Issues & Facts 6 ("While Reiner has retained his Grade 14 position, it is as the Security Officer which is not a Squad Supervisory position. Indeed, Security Officer positions can be filled by employees who are not FBI Agents.").[6] In sum, Reiner has failed to provide *any* evidence to support a reasonable juror's finding that he suffered an adverse employment action.

### C. Plaintiff Caldwell, who voluntarily withdrew from his position, did not suffer an adverse employment action.

Plaintiff Caldwell has also failed to show, as a matter of law, that he suffered an adverse employment action as a result of the FBI's policy. Prior to the expiration of his SSA term, Caldwell "voluntarily withdrew from the management program" instead of accepting a lateral position supervising a new squad. *See* Caldwell Statement 6, 8. After

---

[6] Reiner also claims that "he was well known in the community that then learned he had lost his Field Supervisor Status." Pls.' Opp'n 6; *see also* Reiner Statement 5 ("I lost the job satisfaction of being in a position in which I felt I excelled and contributed greatly to the FBI's mission."). But, this purely subjective injury is irrelevant to whether he suffered an adverse employment action. *Forkkio*, 306 F.3d at 1130-31 ("Purely subjective injuries, such as dissatisfaction with a reassignment . . . or public humiliation or loss of reputation . . . are not adverse actions.") (internal citations omitted).

he was informed that his squad was being disbanded, Caldwell himself had suggested to his supervisor that he oversee this new squad in Pittsburgh. Caldwell Statement 6; Pls.' Issues & Facts ¶ 4. Although his supervisor agreed to this request, Caldwell later "declined the offer . . . because the commuting time . . . is approximately one and a half hours each way" and he "would only have been permitted to remain a supervisor until August 25, 2009" because of the policy. Caldwell Statement 6; Pls.' Issues & Facts ¶ 4. Caldwell does not claim that the FBI discriminated against him by disbanding his squad or that his decision was involuntary. And so, he cannot show that he suffered an adverse employment action because of the FBI's policy.

### D. Plaintiffs Powers, Lester, and Stone voluntarily retired from the FBI and, therefore, did not suffer adverse employment actions.

Powers, Lester, and Stone each maintained SSA positions until they retired from the FBI prior to their SSA terms' expiring. *See supra* pp. 4-5. Ordinarily, that would preclude these plaintiffs from claiming they suffered adverse employment actions. *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). They contend, however, that a jury could find that the FBI coerced their retirements. Pls.' Opp'n 21-23. I disagree.

"Resignations or retirements are presumed to be voluntary," unless an employee can show that the retirement was actually involuntary. 614 F.3d at 566 (quoting *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring)). The test for whether a retirement is considered involuntary is an "objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Id.* (citing *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 194 (5th Cir. 1988)).

Specifically, a plaintiff must show the following: "[1] an agency imposes the terms of an employee's resignation, [2] the employee's circumstances permit no alternative but to accept, and [3] those circumstances were the result of improper acts of the agency." *Keyes v. District of Columbia,* 372 F.3d 434, 439 (D.C. Cir. 2004) (quoting *Schultz v. U.S. Navy,* 810 F.2d 1133, 1136 (Fed. Cir. 1987)).[7]

Although plaintiffs, citing a Federal Circuit decision, recite this same test, they do not explain how they meet any of these criteria. *See* Pls.' Opp'n 22 (citing *Shoaf v. Dep't of Agric.,* 260 F.3d 1336, 1341 (Fed. Cir. 2001)); *compare Keyes,* 372 F.3d at 439. Rather, plaintiffs contend that "based on the fact that if Powers, Stone, and Lester had continued their employment, they would suffer a loss of income from $15,000 to $20,000 a year, a jury could easily find that it was reasonable for these Agents to decide to retire and find employment outside the FBI." Pls.' Opp'n 22-23. Plaintiffs are off the mark. The relevant question is not whether these plaintiffs made a reasonable, personal decision to retire but whether a "reasonable person in the employee's position would have felt *compelled* to resign under the circumstances." *Aliotta,* 614 F.3d at 566 (emphasis added).

Viewing the evidence in the light most favorable to the plaintiffs, it is clear that none of these plaintiffs could show they retired involuntarily. First, Powers admits that he had found another position before retiring from the FBI but claims that the policy "forced him to retire early despite not having planned to retire." Pls.' Opp'n 9. He also

---

[7] Other relevant facts include: "did the person receive information about what would happen in response to the choice? Was the choice free from fraud or other misconduct? Did the person have an opportunity to say no?" *Aliotta,* 614 F.3d at 566-67 (quoting *Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824, 828 (7th Cir. 1987)).

states that a personal hardship prevented him from seeking another job at the FBI. *Id.*; Powers Statement 5-7. Second, Lester "would have preferred to stay in the FBI until the mandatory retirement age" but claims that "he would have faced financial hardship during the last years in his FBI career if he had to move from Dallas, Texas to Washington, D.C. or step down to a GS-13 and take a pay reduction." Pls.' Issues & Facts ¶ 6; Lester Statement 3. Finally, Stone chose not to seek a promotion because that "would not have made sense because he was approaching mandatory [FBI] retirement." Pls.' Issues & Facts ¶ 5. Instead, he requested an extension of his SSA term to complete 30 years of FBI service. *Id.*[8]

These three plaintiffs may have faced difficult decisions, but not coercion. *See Keyes*, 372 F.3d at 439 ("[W]here an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act.") (quoting *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)). The FBI did not impose the terms of their resignations. The plaintiffs could have chosen from a number of FBI career-alternatives—even though some may have been personally difficult. *See* Def. Ex. A, 2004 Policy Mem. 6-7 (listing career options for affected SSAs). Instead, each made a subjective decision based in part on personal circumstances. Further, plaintiffs have not even attempted to argue that their resignations or circumstances were the result of any

---

[8] Stone states that he was granted the extension upon the condition that he formally submit his retirement papers. *Id.* But, the FBI did not impose his resignation terms as Stone could have sought a promotion instead of an extension.

improper acts or misconduct by the FBI.[9] *See* Def.'s Reply 16. These three plaintiffs, therefore, can show neither that the FBI coerced them to retire nor that they suffered adverse employment actions.

## II. Plaintiffs' Disparate-Impact Claims Are Not Legally Cognizable.

Additionally, the defendant has moved to dismiss for lack of subject matter jurisdiction the plaintiffs' disparate-impact claims.[10] Def.'s Mot. 1. In particular, plaintiffs have alleged that "data accumulated by the FBI show that the term limit policy would have a disproportionate impact on Agents who were more than 40 years of age." Compl. ¶ 8; *see also id.* ¶¶ 10-13 (alleging the "FBI has engaged in a number of other personnel practices that disfavor older employees" and identifying several practices).

The ADEA section applicable to federal employers, 29 U.S.C. § 633a (the "federal section"),[11] states that "[a]ll personnel actions affecting employees or applicants for

---

[9] Plaintiffs' reliance on *Cruz v. Department of the Navy*, 934 F.2d 1240 (Fed. Cir. 1991) is misguided as plaintiffs have cited to the dissenting opinion. *See* Pls.' Opp'n 21-22 (arguing that plaintiffs here faced the "precise situation" in *Cruz* because "the FBI ha[d] assured them that unless they abandoned their Supervisory positions they would face adverse actions in the form of demotion or transfer away from the homes they had established over the course of their adult lives"). Defendants correctly point out that the Federal Circuit in *Cruz* held that that employee's resignation had been voluntary. *Cruz*, 934 F.3d at 1244; *see also* Def.'s Reply 14-15.

[10] Disparate-impact, discrimination claims are distinct from disparate-treatment claims. In short, "a disparate impact claim involves employment practices that appear facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Evans v. Atwood*, 38 F. Supp. 2d 25, 28-29 (D.D.C. 1999). Evidence of discriminatory intent is not necessary to prove a prima facie disparate-impact claim. *Aliotta*, 614 F.3d at 565.

[11] Approximately seven years after enacting the ADEA, Congress expanded the statute's scope beyond claims against private employers to include claims against the

employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." § 633a(a). Although this section undoubtedly authorizes disparate-treatment discrimination claims, whether it also authorizes disparate-impact claims is an unsettled question in our Circuit. Indeed, "neither [the D.C. Circuit] nor the Supreme Court has addressed the question whether the ADEA authorizes disparate impact claims against *federal* employers . . . ." *Aliotta*, 614 F.3d at 562 n.4.[12] The Supreme Court has held, however, that a separate ADEA section, 29 U.S.C. § 623(a)(2) (the "non-federal section")— inapplicable to federal employers—supports disparate-impact claims. *Smith v. City of Jackson*, 544 U.S. 228, 232-41 (2005).[13]

---

government at the federal, state, and local levels. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 68 (2000). Congress achieved this expansion in two distinct steps. First, Congress expanded the term "employer" to include state and local governments. 29 U.S.C. § 630(b); 528 U.S. at 68. Second, Congress inserted a wholly separate provision with different statutory language for federal employers. § 633a; 528 U.S. at 68.

[12] Nonetheless, two of my colleagues on this Court, after analyzing this issue, have concluded that disparate-impact claims are *not* available against federal employers. *See Silver v. Leavitt*, No. Civ.A. 05-0968-JDB, 2006 WL 626928 at *13 (D.D.C. Mar. 13, 2006) (Bates, J.); *Evans*, 38 F. Supp. 2d at 28-30 (Urbina, J.); *but see Breen v. Peters*, 474 F. Supp. 2d 1, 7 (D.D.C. 2007) (Roberts, J.) (concluding federal section "encompasses both disparate treatment and disparate impact cases").

[13] In *Smith*, the Supreme Court held that the non-federal section, which is identical to part of Title VII of the Civil Rights Act of 1964, "authorize[s] recovery in 'disparate-impact' cases comparable to *Griggs*." 544 U.S. at 232-36 & n.6 (2005) (referencing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), which held that Title VII supported disparate-impact claims). The Supreme Court limited its ruling to the specific language in subsection two of §623(a). 544 U.S. at 236 n.6. Section 623(a)(2) prohibits non-federal employers from "limit[ing], segregat[ing], or classify[ing] . . . employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." Our Circuit has noted that the *Smith* holding concerned a section inapplicable to federal employers. *Aliotta*, 614 F.3d at 562 n.4.

15

Plaintiffs argue that disparate-impact claims are cognizable against federal employers because the federal section's language "broadly prohibits any discrimination" and is "substantially similar" to the non-federal section's language. Pls.' Opp'n 15-21.[14] Unfortunately for plaintiffs, I find their arguments unpersuasive. The federal section's language is wholly different from the language the Supreme Court relied upon in *Smith* to find that the non-federal section supported disparate-impact claims. Comparing Title VII and the ADEA's non-federal section, the Supreme Court stated in *Smith* that: "Neither [Title VII] nor the comparable language in the ADEA simply prohibits actions that 'limit, segregate, or classify' persons; rather the language prohibits such actions that 'deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's' race or age." 544 U.S. at 235 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) and quoting Title VII). The statute at issue here includes no such language. Instead, Congress "deliberately prescribed a distinct statutory scheme applicable only to the federal sector." *Lehman v. Nakshian*, 453 U.S. 156, 166 (1981).[15] The federal section's language is simple and plain, and neither

---

[14] Plaintiffs rely extensively on the analysis from another decision of this Court, *Breen*, 474 F. Supp. 2d 1. Pls.' Opp'n 18-20. But, that decision is not binding on this Court.

Further, although it is not entirely clear whether plaintiffs quote *Ford v. Mabus*, 629 F.3d 198 (D.C. Cir. 2010) to support their disparate-impact argument, *see* Pls.' Opp'n 11-13, defendants correctly point out that the *Ford* decision was concerned with the causation element in intentional, disparate-*treatment* cases and is thus not determinative of the current issue, Def.'s Reply 6-7.

[15] Moreover, the Supreme Court has stated that the "scope of disparate-impact liability under ADEA is narrower than under Title VII" and noted that Congress limited

expressly nor impliedly authorizes disparate-impact claims. *See* § 633a ("All personnel actions affecting employees . . . shall be made free from any discrimination based on age.").

Plaintiffs also contend that the federal section's "legislative history clearly shows that Congress intended the language to be read inclusively" and that "Congress explicitly waived sovereign immunity" for disparate-impact claims. Pls.' Opp'n 21.[16] But Congress, amending the ADEA after the Supreme Court had already recognized Title VII supported disparate-impact claims, *see Griggs*, 401 U.S. at 432-34, could have copied the Title VII language to the federal section. More simply, when Congress redefined the term "employer" to include state and local government employers, Congress could have included federal employers as well. *See supra* n.11. It didn't, leaving me to conclude that Congress did not intend to expressly waive sovereign immunity for disparate-impact claims against federal employers under the ADEA. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33-34 (1992) ("Waivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed.") (internal citations and quotations omitted).

---

the ADEA "consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment." *Smith*, 544 U.S. at 240.

[16] Plaintiffs do not provide any citations to the ADEA's actual legislative history. *See* Pls.' Opp'n 15-21. Instead, they appear to rely on a citation to another district court's decision that reasoned that although the legislative history of the federal section is "sparse," Congress amended the ADEA after *Griggs* recognized disparate-impact claims under Title VII and thereby intended to include those claims. *See* Pls.' Opp'n 20 (citing *Lagerstrom v. Mineta*, 408 F. Supp. 2d 1207, 1213 (D. Kan. 2006) (citing *Lumpkin v. Brown*, 898 F. Supp. 1263, 1271 (N.D. Ill. 1995)). That decision is, of course, not binding on this Court.

17

When, and if, the Congress chooses to do so expressly, such claims will be cognizable by this Court. In the meantime, considering the federal section's language, the ADEA's overall structure, the Supreme Court's focused analysis in *Smith*, and the absence of an express waiver of sovereign immunity, the Court concludes that the federal section does not authorize disparate-impact claims against federal employers. *See also* Def.'s Mot. 16-20; Def.'s Reply 2-7. Accordingly, plaintiff's disparate-impact claims must, and will, be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendant's motion for summary judgment against these six plaintiffs and GRANTS defendant's motion to dismiss the plaintiffs' disparate-impact claims. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge